## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

REGINELLA CONSTRUCTION )
COMPANY, LTD., )
)
       Plaintiff, )
)
      v. )    Civil Action No. 12-1047
)
TRAVELERS CASUALTY AND SURETY )
COMPANY OF AMERICA, )
)
      Defendant. )

### OPINION

**Mark R. Hornak, United States District Judge.**

This is an action in tort. Plaintiff Reginella Construction Company ("Reginella") asserts claims of breach of fiduciary duty, intentional interference with contractual relations, and tortious bad faith against defendant Travelers Casualty and Surety Company of America ("Travelers") in connection with surety bonds issued for two multi-million dollar construction projects. [ECF No. 1.] Reginella seeks compensatory and punitive damages, interest, attorneys' fees, and costs. Travelers argues that Reginella's fiduciary duty and bad faith claims are not cognizable and that any alleged interference with Reginella's contractual relations was privileged as a matter of law. [ECF No. 7.] This Court's jurisdiction rests on 28 U.S.C. § 1332(a), as Reginella is a Pennsylvania corporation with its principal place of business in Pittsburgh, Travelers is a Connecticut corporation with its principal place of business in New York, and the amount in controversy exceeds $75,000, exclusive of costs and interest.

Before the Court is Travelers's motion to dismiss all six (6) counts of Reginella's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, Travelers's Motion to Dismiss will be granted with prejudice.

## I.  FACTUAL BACKGROUND

The facts set forth below are derived from Reginella's Complaint and the undisputedly authentic documents attached to Travelers's Motion to Dismiss. Reginella is a Pittsburgh-based construction company whose primary business is public construction. Over the past 25 years, Reginella has completed numerous multi-million dollar construction projects for school districts, state universities and agencies, municipalities, and other public owners. Travelers is one of the nation's largest underwriters of insurance and surety contracts.

By way of background, it is common practice in the construction industry for general contractors to purchase surety bonds which guarantee the general contractor's performance of the work and its payment of subcontractors and suppliers. This arrangement is designed to minimize the "enormous business risks" inherent in large-scale and logistically complicated construction projects, "any one of which could seriously impact the successful completion of the contract and financial solvency of all involved." Philip L. Bruner and Patrick J. O'Connor, Jr., 3 BRUNER & O'CONNOR ON CONSTRUCTION LAW § 12:1 (2012). Even though the principal (in this case, Reginella) obtains and pays the premium due on the bond, it is typically only the project owners (here, the MASD and the OTC), subcontractors, and suppliers who are entitled to make claims and receive payment. The surety company (in this case, Travelers) receives fees and premium in exchange for underwriting the bond and assuming the risk that claims might be filed.

From June 2009 to June 2011, Travelers was Reginella's surety. This cause of action arises out of Travelers's provision of three surety bonds for two separate multi-million dollar

2

construction projects.   The first two surety bonds were for Reginella's contract with the Moon Area School District ("the MASD") in Moon, Pennsylvania for the conversion of the district's high school into a middle school.   The third surety bond was for Reginella's contract with the Ohio Turnpike Commission ("the OTC") for the re-construction of two service plazas along the Ohio Turnpike.   According to Reginella, Travelers's conduct has cost it $15,607,000 in lost business, goodwill, future earnings, and residual value of its enterprise.

## A.   The Moon Area School District Project

On August 10, 2010, Reginella contracted with the MASD to convert its high school into a middle school.   The contract price for the project was $19,297,000.   The construction contract required Reginella to obtain surety bonds guaranteeing Reginella's performance of the work and the payment of its subcontractors and suppliers.

### 1.   Course of Performance of the MASD Project

Between August 2010 and April 2012, Reginella alleges that it performed its contractual obligations without incident.   However, sometime in mid-April 2012, relations between the parties began breaking down.   On April 26, Travelers sent a letter to the MASD demanding payment on the project for "the entire amount of the contract funds remaining in the custody of [the MASD], including any and all estimates earned by [Reginella] but unpaid at this time." [ECF No. 1, ¶ 44.]   Reginella alleges that this demand was unfounded.

In response to Travelers's letter, the MASD informed Reginella that it would not make any further payments to Reginella "until such time that an agreement is reached among the School District, Travelers and your company regarding distribution of future earned contract funds."   [Id. at ¶ 46.]   While the MASD approved a $554,702 invoice that Reginella sent

immediately following Travelers's April 26 letter, the MASD declined to pay it.  On May 24, 2012, Reginella informed the MASD that without payment, the project would come to a halt. Reginella then proposed payment procedures designed to assure its subcontractors that they would be paid in order to keep the project from shutting down.  The MASD advised Travelers of Reginella's offer, ostensibly to persuade Travelers to release payment to the subcontractors. Despite these efforts, neither the MASD nor Travelers released payment to either the subcontractors or Reginella.

By mid-June, approximately two weeks after Reginella's warning that the project was in jeopardy, neither the MASD nor Travelers had released payment to Reginella or its subcontractors.   Around this time, Reginella alleges that Travelers met privately with the subcontractors and informed them that the MASD was going to terminate the project, which Reginella alleges induced the subcontractors to slow down, stop working, and submit inflated and premature claims against Reginella.  These events culminated in the shutdown of the MASD project on June 11, 2012.

## 2.   The MASD Bond Agreements

Travelers issued two surety bonds for the MASD project, a performance bond and a payment bond, together in the full contract price of $19,297,000.  Under the performance bond agreement, Travelers would be required to step in and guarantee Reginella's performance only in the event that Reginella defaulted.  [ECF No. 7, Ex. 2, § 2.]  Conversely, if the MASD were to be in default of its obligation under the construction contract to pay Reginella for the work, Travelers would not be obligated to guarantee Reginella's performance.

Travelers's obligations under the performance bond would arise if: (1) the MASD notified Reginella and Travelers of its intention to declare Reginella to be in default and

4

Reginella is given an opportunity to cure, but does not do so; (2) the MASD declared Reginella to be in default and terminated the construction contract; and (3) the MASD agreed to pay the balance of the contract to Travelers in accordance with the construction contract, or to another contractor selected to finish the project. [Id. at § 3-3.3.] Subsequently, Travelers would be required, at its own expense, to either: (1) arrange for Reginella, with the MASD's consent, to perform and complete the contract; (2) undertake to perform and complete the contract itself, through its agents or independent contractors; (3) obtain bids or negotiated proposals from qualified contractors acceptable to the MASD to complete the work; or (4) waive its right to perform and complete the contract and either pay the MASD for any resulting liability or deny liability, citing the reasons therefor. [Id. at § 4-4.4.]

The payment bond agreement provides that "[Travelers] shall have no obligation to [the subcontractors, suppliers, laborers, and other claimants]" until they "have given notice to [Travelers and the MASD] stating that a claim [for payment] is being made under this Bond." [Id. at Ex. 3.] Upon receiving a properly submitted claim, Travelers would be obligated to promptly "pay or arrange for payment of any undisputed amounts" at its own expense. [Id. at Ex. 3, § 6.2.]

In its Complaint, Reginella alleges that Travelers breached its fiduciary duty to Reginella as its surety on the MASD project (Count Two), that Travelers intentionally interfered with Reginella's business relationships with the MASD and its subcontractors (Counts Three and Four), and that Travelers acted in bad faith in refusing to pay Reginella's subcontractors as required under the terms of the bond agreements on the MASD project (Count Six). Travelers asserts that as a matter of law it had no fiduciary duty to Reginella, that its alleged interference

with the MASD and Reginella's subcontractors was privileged, and that Pennsylvania law does not recognize a tort-based bad faith claim by a principal against a surety.

## B.  **The Ohio Turnpike Commission Project**

On December 17, 2010, Reginella submitted a bid to the OTC for the reconstruction of two service plazas along the Ohio Turnpike. Travelers issued the necessary bid guarantee and contract bond in the full contract price of $9,930,730.

### 1.   **Course of Performance of the OTC Project**

Following the execution of the contract bond and the construction agreement, Reginella retained subcontractors and began work on the OTC project.  In June 2011, six months after construction began, Reginella ended its bonding relationship with Travelers, although the contract bond for the OTC project still remained in place. [ECF No. 1, ¶ 10.]  In November 2011, Reginella terminated its contract with one of its subcontractors, 21st Century Concrete Construction, Inc. ("21st Century").  Following its termination, 21st Century filed a claim in the form of a $533,226 lien against the project, which under Ohio law enabled the OTC to withhold payment from Reginella in the lien amount until Reginella obtained a lien-over bond[1] to guarantee payment of the claim.  Even though Reginella contested the lien in Ohio state court as "bogus and inflated," the OTC refused to pay Reginella until it obtained the lien-over bond. Reginella alleges that this withholding of payment prevented it from paying other amounts it owed to other subcontractors, suppliers, and laborers.

---

[1] A lien-over bond allows a subcontractor or supplier who has filed a lien against funds that are held by a project owner and owed to the general contractor to receive payment from a surety, which permits the project owner to remit the funds to the general contractor, thus enabling the construction project to proceed without incident. This instrument essentially permits the general contractor to "bond over" a lien filed by a subcontractor or supplier. See generally BRUNER AND O'CONNOR, § 8.124 and 8.137; see also ECF No. 14, p.8 n.3.

In January 2012, two months after it fired 21st Century and six months after its active business relationship with Travelers ended, Reginella asked Travelers to issue the lien-over bond in accordance with its continuing obligations under the contract bond.   Travelers refused, claiming that the contract bond did not require it to issue lien-over bonds, that Reginella should seek the bond from its new surety, and that the contract bond required the OTC to release payment.  The OTC disagreed, and instead claimed that the lien-over bond must be issued before the OTC could release payment of the contested amount to Reginella.   Requests for both payment of the claim and the lien-over bond continued into March 2012.  Around this time, other subcontractors began filing liens against the project, which Reginella also contested as "bogus and inflated."

On April 20, 2012, Reginella offered to divert all payments from the project to Travelers if it would issue the lien-over bonds, but Travelers refused.  Negotiations between Reginella, Travelers, and the OTC stalled until the OTC terminated its contract with Reginella on May 22, 2012.

### 2.   The OTC Bond Agreement

Travelers furnished Reginella with a bid guarantee and contract bond in connection with the OTC project in December 2010.  The contract bond guaranteed Reginella's performance of the work as well as Reginella's payment of "all lawful claims of Subcontractors, Material Suppliers and laborers" in the event of its default.  [ECF No. 7, Ex. 4.]  The contract bond also states that its purpose was to "benefit any Subcontractor, Material supplier or laborer having a just claim, as well as for [the OTC]."  [Id.]

Reginella claims that Travelers breached its fiduciary duty as Reginella's surety (Count One) and that it acted in bad faith in refusing to issue the lien-over bonds as allegedly required

by the contract bond (Count Five). Travelers asserts that Ohio law does not impose fiduciary duties on a surety and, like Pennsylvania law, does not recognize tort bad faith claims by a principal against a surety. Consequently, Travelers moves for dismissal of the claims.

## C. **The General Indemnity Agreement**

In addition to the bond agreements, the parties entered into a General Agreement of Indemnity ("Indemnity Agreement") in Pittsburgh at the start of their business relationship in June 2009. This agreement remained in force during the MASD and OTC projects. The Court is aware of this document only because Travelers attached it as an exhibit to its Motion to Dismiss. Reginella does not mention the Indemnity Agreement in its Complaint, and the parties dispute whether the Court may consider it in ruling on the Motion to Dismiss. Because the Court cannot evaluate whether Reginella's fiduciary duty and tort claims are properly pled without fully understanding the legal foundations of the parties' business relationship, which necessitates a review of the Indemnity Agreement, it is appropriate for the Court to consider the document in ruling on the Motion to Dismiss.

### 1. **Consideration of the Indemnity Agreement**

Reginella argues that the Court may not consider the Indemnity Agreement because it "is not the basis of any of [Reginella's] claims in this lawsuit." [ECF No. 14, p.16.] The Court disagrees. To be absolutely clear, Reginella argues only that its tort claims are not based on the Indemnity Agreement. Reginella does not dispute the interpretation of the Indemnity Agreement's terms, its authenticity, or its enforceability.

When ruling on a Motion to Dismiss, "courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record."

8

Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). However, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on that document. Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied." Id. (internal citations omitted). Other courts of appeals have termed this principle the "incorporation by reference doctrine" and, consistent with the reasoning in Pension Benefit, have applied the doctrine "to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005)(citing Parrino v. FHP, Inc., 146 F.3d 699, 706 (7th Cir. 1998) and Horsley v. Feldt, 304 F.3d 1125, 1135 (11th Cir. 2002)).

The Court finds that for these purposes, the Indemnity Agreement must be considered incorporated by reference into Reginella's Complaint. The Indemnity Agreement required Reginella to completely indemnify Travelers in the event that Reginella defaulted on its obligations to a project owner, and explicitly states that it was entered into as "an inducement to [Travelers] and in consideration of [Travelers's] execution and/or delivery of one or more Bonds" during their business relationship. [ECF No. 7, Ex. 1.] In its brief in opposition to Travelers's Motion to Dismiss, Reginella describes Travelers's attachment of the Indemnity Agreement as a gambit in support of its "self-serving view of the relationship of the parties." However, Reginella then concedes that the relevant relationship for the purposes of its Complaint is the "relationship between and among the parties who were involved in the Moon and Ohio Turnpike Projects – namely, [Reginella], OTC, MASD and Travelers (as surety)." [ECF No. 14,

pp.15-16.]  If the only relevant relationship is that between these four parties, and that relationship is based on the surety bonds, then it inexorably follows that the very agreement upon which the bonds are based is part of that relationship as well.

Reginella cannot bring claims against Travelers for its alleged behavior during their business relationship, yet protest the Court's full review of the legal nature of that relationship. Otherwise, "a plaintiff with a legally deficient claim could survive a motion to dismiss" simply by shrewd pleading. Pension Ben. Guar. Corp., 998 F.2d at 1196. To properly plead a breach of fiduciary duty claim, Reginella must first plead the existence of a fiduciary relationship between itself and Travelers. Baker v. Family Credit Counseling Corp., 440 F.Supp.2d 392, 414 (E.D.Pa. 2006).  The Court cannot determine whether a fiduciary relationship exists without understanding the legal underpinnings of the parties' relationship. Likewise, to determine whether tort claims for intentional interference and bad faith have been properly pled, the Court must first determine the extent to which a valid contract between the parties governs the conduct at issue. Glazer v. Chandler, 200 A.2d 416, 418 (Pa. 1964). The Indemnity Agreement is relevant to these determinations, which must be made at the Rule 12(b)(6) stage because they are dispositive of whether Reginella has raised legally sufficient claims. It is therefore appropriate for the Court to consider the Indemnity Agreement in ruling on the Motion to Dismiss.

## 2.  Terms of the Indemnity Agreement

The Indemnity Agreement provides that Reginella would be in default on a construction contract if: (1) a project owner declared Reginella to be in default; (2) Reginella breached the Indemnity Agreement; (3) Reginella failed to pay a properly due and owing bill in connection with any construction contract; or (4) Reginella went into bankruptcy. [ECF No. 7, Ex. 1.] As a

remedy to Reginella's default, Travelers would "have the right in it its sole discretion to" take any of the following actions:

> (a) take possession of the work under any Contract and to complete said Contract, or cause, or consent to, the completion thereof; (b) immediately take possession of [Reginella's] Property, and utilize the Property for the completion of the work under the Contracts without payment for such use; (c) assert or prosecute any right or claim in the name of [Reginella] and to settle any such right or claim as [Travelers] sees fit; (d) execute in the name of [Reginella], any instruments deemed necessary or desirable by [Travelers] to: (i) provide [Travelers] with title to assets, (ii) take immediate possession of Contract funds whether earned or unearned, (iii) collect such sums as may be due [Reginella] and to endorse in the name of [Reginella], and (iv) collect on any negotiable instruments; (e) require any [project owner] to withhold payment of Contract funds unless and until [Travelers] consents to its release; and/or (f) be subrogated to all the rights, remedies, properties, funds, securities and receivables relating to [Reginella's] Contracts or contracts and have the right to offset losses on any Contract or Bond against proceeds, funds, or property due from another Contract, bond or contract.

[Id.]

Furthermore, the Indemnity Agreement provides that "in the event of Default and upon demand, [Reginella] shall direct that all payments, monies, and properties that are due or may become due on any Contract or contract be made payable to, and/or sent directly to, [Travelers], and shall issue whatever writing or notices as deemed necessary by [Travelers] to effectuate the default and/or termination of any Contract." [Id.] As stated previously, neither party disputes the applicability of the Indemnity Agreement to the MASD and OTC bond agreements, its authenticity, or its enforceability.

## II. **STANDARD OF REVIEW**

### A. **Motion to Dismiss**

Federal Rule of Civil Procedure 12(b)(6) empowers a district court to dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A complaint is facially plausible if it alleges sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. However, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678.

In addition to pleading adequate factual content, the complaint also must be legally sufficient. Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 555. To determine the complaint's legal sufficiency, the court must accept as true all of the facts, but not the legal conclusions, alleged, draw all reasonable inferences in the plaintiff's favor, and confirm that the accepted-as-true facts actually give rise to a claim that would entitle the plaintiff to relief. Id.; Inv. Syndicate of Am., Inc. v. City of Indian Rocks Beach, 434 F.2d 871, 876 (5th Cir. 1970)(standard posed under Rule 12(b)(6), like its common law antecessor, the demurrer, is "if every fact alleged by the opposite party be taken as established, the pleader is still entitled to no relief against me").

A court may not dismiss the complaint merely because it appears that the plaintiff cannot prove the facts alleged or will not ultimately prevail on the merits. Twombly, 550 U.S. at 556, 563 n.8. Instead, it must ask whether the facts alleged raise a reasonable expectation that discovery will reveal evidence of the necessary elements. Id. at 556. The motion to dismiss should not be granted if the plaintiff alleges facts which could, if established at trial, entitle him

to relief. Id. at 563 n.8. In ruling on the motion, a court may consider only the complaint, attached exhibits, matters of public record, and undisputedly authentic documents not attached to the complaint if the complainant's claims are based on those documents. Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010). In considering external yet undisputedly relevant and authentic documents, the court need not convert the motion to dismiss into a motion for summary judgment. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

## B. Choice of Law

The first task of a federal court sitting in diversity is to determine which state's substantive law applies. Because these tort claims are proceeding in a federal court in Pennsylvania, the Court must apply Pennsylvania's choice of law rules. Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). In determining which state's law applies in tort and contract disputes, Pennsylvania courts use the "most significant relationship" test, which qualitatively weighs the parties' contacts with the forums "according to their relation to the policies and interests underlying" the issues in dispute. Hammersmith v. TIG Ins. Co., 480 F.3d 220, 231 (3d Cir. 2007); Am. Contract Bridge League v. Nationwide Mut. Fire Ins. Co., 725 F.2d 71, 74 (3d Cir. 1985)(discussing Griffith v. United Air Lines, Inc., 203 A.2d 796 (Pa. 1964)). A choice of law analysis is appropriate at the Rule 12(b)(6) stage when it is not dependent on factual issues that can be probed only with the assistance of a fully developed record. Carton v. Gen. Motor Acceptance Corp., 611 F.3d 451, 454-55 (8th Cir. 2010); Snyder v. Farnam Companies, Inc., 792 F.Supp.2d 712, 718 (D.N.J. 2011); Cooper v. Samsung Electronics America, Inc., 374 Fed.Appx. 250, 257 n.5 (3d Cir. 2010).

Reginella's Complaint asserts six (6) counts. Four of those counts (Counts Two, Three, Four, and Six) arise from business relationships entered into and performed in Pennsylvania for

the intended benefit of a Pennsylvania municipal entity, the MASD.  The parties to these Counts are a Pennsylvania corporation and a foreign corporation that established minimum contacts with Pennsylvania.  No other state is involved.  Therefore, it is clear that Pennsylvania law applies to these Counts.

The choice of law analysis also weighs in favor of applying Pennsylvania law to the OTC claims (Counts One and Five) as well.  The first step in the Griffith analysis is to determine whether there is an actual conflict between the laws of the potential forums.  Hammersmith, 480 F.3d at 229.  If there are no relevant differences between the substantive laws of the forums or the laws would produce the same result, no actual conflict exists, and the court may refer to the forums' laws interchangeably.  Id.

Neither the Pennsylvania nor the Ohio Supreme Courts have specifically held whether a principal may bring a breach of fiduciary duty or a tort bad faith claim against a surety.  Therefore, the Court's application of the law is based on analogous precedent and other reliable indicators.  Nationwide Ins. Co. v. Resseguie, 980 F.2d 226, 229 (3d Cir. 1992).  As discussed below, the Court predicts that the Pennsylvania Supreme Court would not hold a surety to a fiduciary standard of conduct and would not permit a tort bad faith claim to lie when the terms of a contract between the parties governs the conduct at issue.  The Court also predicts that the Ohio Supreme Court would reach the same result.  See Int. Fid. Ins. Co. v. Vimas Painting Co., Inc., 2008 WL 926577, at *4-5 (S.D. Ohio Apr. 3, 2008)(Ohio Supreme Court cases comparing surety contracts to insurance contracts indicates that a surety is not a contractor's fiduciary); Suver v. Personal Service Ins. Co., 462 N.E.2d 415, 417 (Ohio 1984)(an injured third party, but not the principal, may pursue a tort bad faith claim against the issuer of a financial responsibility bond); Am. Contractor's Indemn. Co. v. Nicole Gas Prod., Ltd. 2008 WL 4416671, at *3 (Ohio App. 10

14

Dist. Sept. 30, 2008)(Ohio Supreme Court's opinion in <u>Suver</u>, permitting a third-party tort bad faith claim against the guarantor in an automobile lawsuit, is inapplicable to construction lawsuits); <u>Ketcham v. Miller</u>, 136 N.E. 145, 146 (Ohio 1922)(breach of a contract does not constitute a tort).

Accordingly, there is no actual conflict between Pennsylvania and Ohio law regarding the claims made in Counts One and Five. Because the parties conducted dealings with respect to the OTC contract in Pennsylvania [ECF No. 14, p.20 n.9] and Ohio's relation to the dispute is purely locational [<u>see</u> ECF No. 1, ¶¶ 11-40], we will refer to Pennsylvania law with respect to these claims as well.

## III. <u>DISCUSSION</u>

### A. <u>Fiduciary Duty Claims</u>

Reginella alleges that Travelers, as its surety, owed it a fiduciary duty and breached that duty by interfering with its ancillary business relationships and acting in bad faith. These claims fail for two reasons. First, we predict that, as a matter of law, the Pennsylvania Supreme Court would not impose fiduciary duties on a surety. Second, the facts alleged in the Complaint, even when accepted as true and construed in the light most favorable to Reginella, fail to show that a fiduciary relationship arose between the parties during their course of dealing.

### 1. <u>General Principles</u>

To plead a claim for breach of fiduciary duty under Pennsylvania law, the plaintiff must first prove the existence of a fiduciary relationship. <u>In re Estate of Clark</u>, 359 A.2d 777, 781 (Pa. 1976); <u>Baker</u>, 440 F.Supp.2d at 414. A fiduciary relationship exists "whenever one person has reposed a special confidence in another to the extent that the parties do not deal with each other

on equal terms." Clark's Estate, 359 A.2d at 781.  In contrast to an ordinary arm's-length relationship where each party owes the other only a duty of good faith and fair dealing, a fiduciary "must act with scrupulous fairness and good faith in his dealings with the other and refrain from using his position to the other's detriment and his own advantage." Young v. Kaye, 279 A.2d 759, 763 (Pa. 1971).  The party arguing for the fiduciary relationship bears the burden of proving it exists. Wiskiski v. Brown & Brown Ins. Co. of PA, 906 A.2d 571, 579 (Pa. Super. 2006).

A fiduciary relationship may be established in one of two ways.  First, it may be shown by demonstrating the existence of a relationship ordinarily known to be fiduciary as a matter of law, such as that between a "trustee and [beneficiary], guardian and ward, attorney and client, and principal and agent." Leedom v. Palmer, 117 A. 410, 412 (Pa. 1922).  Second, it may be established as a matter "of fact to be decided by evidence." Id.  The "disparity in position between the parties" is the key factor in determining whether a fiduciary-in-fact relationship developed between parties in an otherwise arm's-length business relationship. Weir by Gasper v. Ciao, 521 A.2d 819, 825 (Pa. 1989).

### 2.  Surety Contracts and Fiduciary Duties

The Pennsylvania Supreme Court has not squarely decided whether a surety contract gives rise to a fiduciary relationship between a surety and a principal.  Therefore, this Court must predict how that court would rule. Resseguie, 980 F.2d at 229.  To make this prediction, we must "consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data." Id.

a. **Pennsylvania Case Law on Sureties, Insurers, and Commercial Guarantees**

Pennsylvania case law comparing surety bonds to insurance contracts strongly indicates that the Pennsylvania Supreme Court would not impose fiduciary duties on a surety. Surety bonds and insurance contracts are similar to one another in that they both involve a principal's remittance of premium to an obligor in exchange for payment in the event of an agreed-upon contingency. It has long been settled that an insurer owes a fiduciary duty to an insured in settling claims filed under an insurance policy. Birth Center v. St. Paul Companies, Inc., 787 A.2d 376, 379 (Pa. 2001). However, no similar duty has been explicitly recognized in the context of surety contracts. To the contrary, the Pennsylvania Supreme Court has implicitly adopted the Pennsylvania Commonwealth Court's conclusion that "surety bonds are in the nature of commercial guarantee instruments rather than policies of insurance," and that as a consequence, "suretyship is not insurance." Grode v. Mutual Fire, Marine and Inland Ins. Co, 572 A.2d 798, 806 (Pa. Cmwlth. 1990), aff'd in relevant part, sub nom, Foster v. Mutual Fire, Marine and Inland Ins. Co., 614 A.2d 1086 (Pa. 1992).

The underlying economics of suretyship also weigh against transmuting a surety into a fiduciary. First, a surety bond is a financial credit product, not an insurance contract; second, the surety has a contractual relationship with two parties that often have conflicting interests, namely the owner of the project and the principal, which causes the surety to balance these interests when responding to claims; third, the parties to a surety contract are typically commercially sophisticated, have relatively equal bargaining power and ample access to legal and technical advice; fourth, the pricing of the premium by the surety is not based upon the risk of fortuitous loss (as is the case in insurance contracts), but rather on the assumption that the principal will reimburse the surety in the event of the principal's default and surety's corresponding loss; fifth,

17

the principal purchases the bond from the surety not for its own benefit, but for the benefit of its customer, the project owner; and sixth, the principal must usually agree to indemnify the surety if claims are filed, which is the reverse of an insurance contract, where the insurer agrees to indemnify the principal who owns the policy. See U.S. ex rel. SimplexGrinnell, L.P. v. Aegis Ins. Co., 2009 WL 90233, at *3-4 (M.D. Pa. 2009); see also Bruner and O'Connor, §§ 10:201, 12:7.

Based on these authorities, the Court draws the following three conclusions regarding the state of the applicable Pennsylvania law: first, that surety bond agreements are standard commercial contracts; second, that imposing a fiduciary relationship between parties to a contract is the exception rather than the rule; and third, that a surety is not an insurer. See Young, 279 A.2d at 759, 763; Grode, 572 A.2d at 806. If a surety is not an insurer, and the contracts it enters into with its customers are ordinary arm's-length commercial guarantees, it follows that a surety's obligations to its principal are not the same as the heightened obligations that insurers owe to their insured. Perhaps most importantly, the principal-surety relationship is riddled with conflicting interests and split loyalties, which fiduciaryship by definition forbids. McCarrell v. Cumberland County Employees Ret. Bd., 547 A.2d 1293, 1296 (Pa. Cmwlth. 1988). Thus, this Court predicts that if the Pennsylvania Supreme Court were directly presented with this issue, it would hold that as a matter of law, a surety does not owe a fiduciary duty to its principal.

### b.  **Fiduciary Duties and Contractual Relationships**

Even though we predict that the Pennsylvania Supreme Court would not hold a surety to be a fiduciary as a matter of law, we must still consider whether that court would nonetheless find the existence of a fiduciary relationship between these parties based on the nature of their

relationship. Basile v. H & R Block, Inc., 777 A.2d 95, 100, 107 (Pa. Super. 2001)(concluding that the relationship between a customer and tax preparer is not fiduciary per se, but that the instant record could give rise to a fiduciary relationship).

While fiduciary duties may arise in the course of a business relationship, a contractual association by itself does not necessarily give rise to fiduciaryship. eToll, Inc. v. Elias Savion Advertising, Inc., 811 A.2d 10, 23 (Pa. Super. 2002).  Because "[m]ost commercial contracts for professional services involve one party relying on the other party's superior skill or expertise in providing that particular service," every contractual relationship will involve some imbalance of qualities, talents, or position between the parties. Id. Rather, the critical question is "whether the relationship goes *beyond* mere reliance or superior skill, and into a relationship characterized by overmastering influence on one side or weakness, dependence, or trust, justifiably reposed on the other side," such that the parties' relationship "is marked by such a disparity in position that the inferior party places complete trust in the superior party...so as to give rise to a potential abuse of power." Id. at 23-24 (emphasis in original).

An "overmastering influence" exists when the position of the parties is "so extremely one-sided" that one party completely controls the relationship, or when one party acts as advisor or counselor to another who is in "a position of pronounced economic and intellectual weakness." See Wisniski, 906 A.2d at 578-79 (no fiduciary relationship arose between an insurance broker and his individual clients, because although some clients "unthinkingly" accepted the broker's advice, others were "picky shopper[s]" who challenged the broker's every decision); Basile, 777 A.2d at 101-106 (commercial income tax preparer became its low-income customers' fiduciary by soliciting them through an aggressive advertising campaign knowing they would be completely beholden to its expertise).

Even if Reginella were to prove every fact it alleges in its Complaint, it still would not be entitled to relief on its fiduciary duty claims, because the facts fail to establish that a fiduciary relationship existed between it and Travelers.  First, on Reginella's side of the relationship, there was no "extremely one-sided" weakness, dependence, or justifiably reposed trust.  The record demonstrates that Reginella is a twenty-five year veteran of the multi-million dollar public construction industry, with bargaining power and access to sophisticated legal and financial advice.  It therefore cannot claim that it was in a "position of pronounced economic and intellectual weakness" and was uniquely vulnerable to manipulation and exploitation.  Id. at 103-104.  To the contrary, Reginella purchased from Travelers a commercial guarantee for the benefit of its customers, which it was accustomed to doing in the normal course of its business.  Reginella was aware that the bond agreements created contractual obligations between Travelers, the project owners, and the subcontractors that might, in accordance with the terms of the Indemnity Agreement, enable Travelers to take steps against Reginella's interests if it defaulted on the construction contracts.  Perhaps most revealingly, Reginella changed sureties in 2011 after negotiating an arrangement with "a new surety company that offered more favorable terms." [ECF No. 1, ¶ 10.]  Thus, Reginella was not in a position of incurable weakness or dependence, and any trust it allegedly reposed in Travelers to act in its best interests was unjustifiable given the nature of the parties' business relationship.

Similarly, on Travelers's side, none of the facts pled in the Complaint establish that Travelers maintained an overmastering influence over the relationship.  The surety bonds presented Travelers with a significant risk of financial loss if Reginella were to fall short of its contractual obligations.  Specifically, these bonds required Travelers to pay claims filed by Reginella's subcontractors as well as all of the costs necessary to complete the projects if

20

Reginella defaulted.   Although the agreements arguably positioned Travelers to do substantial harm to Reginella's business interests if it were to act in bad faith, they do not go so far as to give Travelers an unfettered ability to exert complete control over the relationship without incurring any risk to its own interests.   To the extent that Reginella predicates its fiduciary duty claims on the magnitude of the damage it allegedly suffered at Travelers's hands, it is incorrect. As Pennsylvania law makes clear, it is the disparity in position between the parties and not the depth of the damage suffered that gives rise to an overmastering influence and fiduciary relationship.  eToll, 811 A.2d at 23.   In a contractual relationship, this disparity involves much more than one party's reliance on the other's performance, as was the case here.  Id.  More broadly, this scheme of risk allocation is the essence of suretyship and is standard practice in the construction industry.  See BRUNER & O'CONNOR, §§ 10:102, 12:7.

For these reasons, as to Counts One and Two of its Complaint, Reginella has failed to state a claim upon which relief can be granted.

## B.  Intentional Interference & Tort Bad Faith Claims

In Counts Three through Six of its Complaint, Reginella alleges that Travelers intentionally interfered in its relationships with its subcontractors and the MASD, and also that it acted in bad faith[2] in preventing Reginella from completing the MASD and OTC projects.  The Complaint makes clear that these claims are being brought in tort and not in contract.  [ECF No.

---

[2] Pennsylvania law permits an insured to pursue a bad faith action in tort against an insurer free of the gist of the action doctrine's bar.  See 42 Pa. C.S.A. § 8371; Birth Center, 787 A.2d at 379.  Despite Reginella's argument to the contrary, there is no tort bad faith claim at common law in Pennsylvania; rather, parties may bring such claims only under section 8731.  See Birth Center, 787 A.2d at 409 (Nigro, J., concurring).  Similarly, although section 8731 is a remedial statute, it applies only to insurers.  Toy v. Metropolitan Life Ins. Co., 928 A.2d 186, 192 (Pa. 2007); see also SimplexGrinnell, 2009 WL 90233 at *3; Ferrick Const. Co. v. One Beacon Ins. Co., 2004 WL 3051443, at *2 (Pa.Com.Pl. Dec. 27, 2004)(both refusing to allow a principal to pursue a bad faith action against a surety under § 8371); Stephen S. Ashley, BAD FAITH ACTIONS: LIABILITY & DAMAGES § 1:2 (2012)("the attempt to extend the bad faith tort beyond insurance has fizzled").  Therefore, absent any contrary guidance and given Pennsylvania law's interest in maintaining clear boundaries between tort and contract actions, we find that the gist of the action doctrine may be applied to bar a tort bad faith claim brought by a principal against a surety.

1, ¶¶ 1, 85, 92, 97, 102, characterizing all six Counts as tort claims and requesting punitive damages, expenses, and fees.] In its Motion to Dismiss, Travelers submits that both claims fail as a matter of law because any alleged interference with Reginella's contractual relations was privileged and Pennsylvania does not recognize common law tort bad faith claims against a surety. It is on those grounds alone that Travelers moves for dismissal of the Complaint.

In evaluating these arguments, the Court notes that each of Reginella's tort claims arises from its contractual relationship with Travelers. This is a critically important feature of this lawsuit. Under Pennsylvania's "gist of the action" doctrine, a plaintiff may not bring a cause of action in tort when the action arises from a matter that is governed by a contract between the parties. eToll, 811 A.2d at 14; see also Glazer, 200 A.2d at 418. The doctrine's applicability in any particular case is a question of law for the court to decide. Alexander Mill Servs., LLC v. Bearing Distrib., Inc., 2007 WL 2907174, at *8 (W.D.Pa. Sept. 28, 2007).

For the reasons that follow, the Court concludes that Counts Three through Six of Reginella's Complaint are barred by the gist of the action doctrine and will be dismissed.

### 1.   The Gist of the Action Doctrine

Pennsylvania's gist of the action doctrine prevents a plaintiff from proceeding on tort claims when those claims are merely "recast[ed] breach of contract claims." eToll, 811 A.2d at 14. The purpose of this barrier is to maintain Pennsylvania law's traditional distinction between breach of contract actions and tort actions. Id.

As the Pennsylvania Superior Court has noted, although contract claims and tort claims often "derive from a common origin," "[t]ort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals. To permit a promisee to sue his

promisor in tort for breaches of contract would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions." Bash v. Bell Tel. Co., 601 A.2d 825, 829 (Pa. Super. 1992)(internal marks omitted). Thus, when the alleged injuries and tortious actions can be traced directly back to rights and duties set forth in the contract, the plaintiff's tort claim is merely a re-casted contract claim and must be dismissed. But when the contract is only collateral to or provides the basic setting for the tortious harm the plaintiff alleges, the tort claim is independent of the contract and may proceed, even though it grew out of the parties' underlying contractual relationship. See eToll, 811 A.2d at 14.

Therefore, the gist of the action doctrine will bar tort claims "(1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract." Id. at 19 (quotations and citations omitted); but see Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc., 530 F.3d 204, 229 (3d Cir. 2008)(when a party acts to protect its interests outside the scope of the agreement, a freestanding tort may lie even though the conduct at issue is ostensibly governed by the contract).

### 2.   Viability of Counts Three through Six

Reginella alleges that Travelers tortiously interfered with its MASD and OTC-related business relationships and that Travelers acted in bad faith by obstructing Reginella's completion of both projects. However, we cannot consider these claims as tort claims because we conclude that the gist of the action doctrine bars them as a matter of law. In doing so, we note that Reginella does not allege that Travelers directly interfered with its obtaining new work from other project owners or that Travelers intentionally damaged Reginella's business interests with

parties who maintained no connection to the MASD and OTC projects. Such actions would be beyond the scope of the parties' existing contractual relationship and may give rise to freestanding tort claims. See, e.g., Adler, Barish, Daniels, Levin and Creskoff v. Epstein, 393 A.2d 1175, 1182-83 (Pa. 1978)(permitting business tort claims to lie because the alleged tortfeaser was unrelated to the business relationship).

It is clear from the language of the indemnity and bond agreements that Travelers's allegedly tortious actions were taken in pursuit of perceived rights and duties that those agreements set forth. With respect to the MASD project, the agreements expressly permit Travelers to take possession of the work, collect payment from the MASD, and arrange for the work's completion in the event of Reginella's default. Regarding the OTC project, the contract bond is silent as to Travelers's obligation to issue additional bonds subsequent to the contract bond's execution. Apart from the fiduciary duty claims, what the parties appear to be disputing is whether Reginella defaulted on the MASD project and whether the contract bond for the OTC project required Travelers to issue lien-over bonds. The only way to answer these questions is to refer to those agreements and the parties' larger course of dealing, the quintessential mode of analysis for a breach of contract claim. See Bash, 601 A.2d at 829.

Furthermore, Reginella's characterization of its purported tort claims shows that they are in fact re-engineered breach of contract claims: "Although [Reginella] is not asserting a claim under the bonds, the terms of those bonds demonstrate the validity of [its] tort claims. In particular, the terms of those bonds establish that Travelers's actions on the Moon and the Ohio Turnpike Projects were not authorized by those bonds. Travelers had no obligations under the bonds for the Moon and Ohio Turnpike Projects unless and until two conditions precedent were present: (1) there could be no "Owner Default;" and (2) [Reginella] must have defaulted in

performance of the construction contract or payment of amounts actually "due" to a subcontractor or supplier." [ECF No. 14, p.17.] Thus, the question begged by Reginella's putative tort claims is whether Travelers breached its contractual duties. However, Pennsylvania law is clear that it is no tort to breach a contract, no matter how much bad faith is alleged.

Accordingly, the Court will dismiss Reginella's intentional interference and bad faith claims with prejudice.

## IV. CONCLUSION

For the reasons set forth above, the Court will grant Travelers's Motion to Dismiss [ECF No. 7] with prejudice. See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 253 (3d Cir. 2007). An appropriate order follows.

Mark R. Hornak
United States District Judge

Dated:  May 30, 2013

cc:     All counsel of record